AO 106 (Rev. 04/10) Application for a Search Warrant **CASE UNSEALED PER ORDER OF COURT** 4/27/2017 (mdc)

SEALED

# UNITED STATES DISTRICT COURT

for the

Southern District of California

FILED

APR 24 2017

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY DEPUTY

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
2701 Island Ave, San Diego, California 92102

Case No. '17MJ1214

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A-1

located in the Southern District of California, there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. §§ 841(a)(1); 846; 843(b); 18 U.S.C. § 1956-1957 | Distribution of Controlled Substances; Conspiracy to Distribute Controlled Substances; Illegal Use of Communications Facility; Money Laundering |

The application is based on these facts:
See Attached Affidavit in Support of Search Warrant

- ☐ Continued on the attached sheet.
- ☐ Delayed notice of ____ days (give exact ending date if more than 30 days: ________ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

[signature]
*Applicant's signature*

HSI S/A Cameron Foster
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 4/24/2017

[signature]
*Judge's signature*

City and state: San Diego, California

Hon. Ruben B. Brooks, United States Magistrate Judge
*Printed name and title*

/mdc

## AFFIDAVIT IN SUPPORT OF APPLICATION

I, Cameron Foster, being duly sworn, declare and state:

## INTRODUCTION

1. This affidavit is made in support of an application to search the residence described as follows:

a) 2701 Island Ave, San Diego, California 92102 ("**Target Location**")

For evidence of violations of Title 21, United States Code, Sections 841(a)(1), 846, 843(b), and Title 18, United States Code, Sections 1956-1957. The **Target Location** has been identified as the residence of Pablo Magdaleno VIELMA-RODRIGUEZ aka "Acapulco." The **Target Location** has been identified as a narcotics distribution and stash house. Therefore, I believe that probable cause exists that evidence, fruits, and instrumentalities of violations of federal criminal laws may be found at the **Target Location**.

## TRAINING AND EXPERTISE

2. I am an "investigative or law enforcement officer of the United States" within the meaning of 18 U.S.C. § 2510(7). As such, I am empowered to conduct investigations of, and to make arrests for offenses enumerated in 18 U.S.C. § 2516. I am cross-designated and have the authority to conduct Title 21 investigations and enforcement activities.

3. I am a Special Agent (SA) with HSI and have been so employed since March of 2012. Since September of 2013, I have been assigned to the HSI BEST Gangs & Weapons Group. From March 2012 to September 2013, I was assigned to the Identify Theft and Benefits Fraud Group. I have received formal training and have experience in narcotics investigations and gang investigations, including street gang investigations. I have participated in multiple separate investigations involving the distribution of controlled substances and firearms. As part of these investigations, I have used various investigative techniques, including physical and stationary surveillance, informants and cooperating sources, court authorized interceptions, pen register/trap and trace devices, telephone toll analysis, undercover operations, physical searches, mail covers, and electronic examinations of evidence. I have monitored numerous calls and meetings with persons

under investigation, including wiretap communications of drug traffickers and gang members and associates. I have worked alongside and consulted with many law enforcement officials and other professionals experienced in drug and gang investigations. Based on my training and experience, I am familiar with how drug traffickers and gang members communicate and operate. For example, I am aware that drug traffickers and gang members discuss criminal matters over the telephone and often use coded or vague language. I am aware of how drug traffickers and gang members organize and operate their illegal activities, including the use of locations, vehicles, and other resources in the furtherance of the illegal activities. I am familiar with the typical make up and operation of gangs and drug trafficking organizations including the distribution, storage, and transportation of the drugs, the collection of money which represents the proceeds of drug trafficking and other criminal activity, and money laundering.

**<u>BASES FOR CONCLUSIONS AND SOURCES OF INFORMAITON</u>**

4. As a result of my training and experience, and my conversations with other Special Agents of HSI, ATF, and DEA, San Diego Police Department (SDPD) Narcotics Detectives and Officers and numerous other local investigators familiar with violent crime, narcotics trafficking, gang activity, and money laundering matters, from the basis of opinions and conclusions set forth below, which I drew from the facts set forth herein. Dates and times outlined below are approximate.

5. I make this affidavit, in part, based upon information from: (a) oral and written reports about this investigation which I have reviewed; (b) physical surveillance conducted by federal agents or local law enforcement agents, which observations have been reported to me either directly or indirectly; (c) a review of pen register and call detail records; and (d) summaries of conversations and electronic communications intercepted pursuant to court-authorized electronic surveillance orders.

6. Except as otherwise noted, information set forth in this affidavit has either been observed or provided to me by HSI special agents or other multi-agency federal, state, and local officers with whom I have spoken, whom were involved in this investigation, or

whose reports I have read and reviewed. Likewise, information resulting from surveillance, except where otherwise indicated, does not necessarily set forth my own observations but rather has been provided directly or indirectly by other law enforcement officers who conducted such surveillance. In this affidavit, I have also included, where appropriate, my interpretation of quoted and/or coded language in parenthesis and/or brackets. Those interpretations are based upon my training and experience, conversations I have had with other law enforcement officers familiar with this investigation, as well as my personal participation in this investigation.

7. Because this affidavit is being submitted for the limited purpose of seeking the search warrants specified below, I have not set forth each and every fact learned during the course of this investigation. Rather, I have set forth only the facts that I believe are necessary to establish the foundation for an order authorizing the requested warrants.

8. I respectfully submit that the facts contained in the numbered paragraphs below demonstrate that there is probable cause to believe that fruits, instrumentalities, and evidence of a violation of the following enumerated offenses: distribution of controlled substance, and conspiracy to do the same (21 U.S.C. Sections 841(a)(1) and 846); illegal use of a communication facility (21 U.S.C. Section 843(b)); and money laundering (18 U.S.C. Sections 1956-1957) (hereinafter collectively referred to as the "Target Offenses") will be found at the **Target Location** which is more fully described in Attachment A-1.

## PROBABLE CAUSE – INTRODUCTION AND BACKGROUND

9. This investigation began in early 2016 and focused on methamphetamine, cocaine, and firearms trafficking by street gang members and associates (primarily Oriental Mafia Crips ("OMC"), West Coast Crips ("WCC"), and Lincoln Park Piru) throughout San Diego. Participating agencies included: HSI Gangs & Weapons Group ("GWG"), San Diego Police Department ("SDPD"), the Drug Enforcement Administration ("DEA"), the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") and the District Attorney's Office ("DA"). Specifically, in January 2016, investigators began investigating the drug distribution activities of Soulidao CHOUNLABOUDY, aka "Lazy," a high-value OMC gang

member involved in drug trafficking. Investigators were able to introduce several undercover agents to CHOUNLABOUDY in order to purchase ounce quantities of methamphetamine, firearms, and stolen vehicles. During the course of these controlled purchases of methamphetamine, investigators learned CHOUNABOUDY was being supplied methamphetamine by Della MERCADO and Elizabeth ANDERSON.

10. In August 2016, investigators initiated a Title III wiretap on CHOUNLABOUDY's telephone (TT1). Through electronic and wire intercepts from TT1, investigators confirmed that CHOUNLABOUDY distributed methamphetamine to fellow gang members and associates. Investigators subsequently identified John QUARLES (WCC), Johnny HERRERA (Paramount 13), Della MERCADO (Sherman Heights), Anthony MOATS (Piru), Larry MULDROW (Piru), and Bradley Scott PITTS (WCC) as methamphetamine sources of supply for CHOUNLABOUDY. Agents also identified the following methamphetamine sub-distributors for CHOUNLABOUDY: Naomi Jean HILL and Elizabeth Ashley ANDERSON. During the course of intercepts of CHOUNLABOUDY, investigators also identified Ruben CONTRERAS-Ramirez, a Claremont 13 gang member, as a firearms distributor involved in the manufacture of assault style semi-automatic firearms for illegal distribution. Investigators subsequently utilized a UC to purchase a semi-automatic handgun from CONTRERAS. Ultimately, investigators seized/CS purchased 352.56 grams of methamphetamine, and two firearms tied to this drug distribution network headed by CHOUNLABOUDY.

11. Investigators subsequently identified John QUARLES, aka "J-Money," as a methamphetamine source of supply for CHOUNLABOUDY, and numerous other gang members. In October 2016, investigators began intercepts on QUARLES' telephone (TT3). In November 2016, investigators continued intercepts on TT3 and initiated intercepts on QUARLES' second telephone (TT4). Investigators also began intercepts on QUARLES' methamphetamine sub-distributor Walter BROWN, aka "Pee Wee" (TT5). In January 2017, intercepts continued on TT4 and QUARLES' new telephone (TT6), and included QUARLES' methamphetamine source of supply, Jose Pedro ESTRADA, Jr., aka "Boy" (TT7) before

terminating in February 2017. Through electronic and wire intercepts from TT3, TT4, TT5, TT6, and TT7 investigators confirmed that QUARLES distributed large quantities of methamphetamine and smaller amounts of cocaine to fellow gang members and associates throughout San Diego.

12. During the course of the investigation, agents conducted extensive physical surveillance in conjunction with the five rounds of wiretap intercepts (along with GPS tracking devices on many of the Target Telephones). Investigators identified multiple locations utilized by the Target Subjects to conduct their drug and firearms trafficking activities. For example, investigators identified Pablo Magdaleno VIELMA-RODRIGUEZ aka "Acapulco" as a methamphetamine sub-distributor for QUARLES. Based on immigration records, it appears that RODRIGUEZ is a Mexican citizen without legal authorization to enter or remain in the United States. Criminal history records also reveal that RODRIGUEZ has previously suffered felony convictions in 1990 for Possession of Marijuana for Sale and in 2006 for Felon in Possession of a Firearm. RODRIGUEZ was intercepted during the investigation utilizing telephone number (619) 693-2586. Based on intercepts, physical surveillance, and a cooperating source, investigators identified the **Target Location** as RODRIGUEZ's residence and narcotics stash house.

## PROBABLE CAUSE – TARGET LOCATION

13. On October 24, 2016, at approximately 8:18 p.m., QUARLES using TT3 received an incoming telephone call from RODRIGUEZ on telephone number (619) 693-2586. RODRIGUEZ asked if QUARLES could come to "Euclid" [Euclid Avenue]. QUARLES affirmed and stated he [QUARLES] had a "Basket of balls" [Methamphetamine broken into 1/8 ounces]. RODRIGUEZ acknowledged. QUARLES and RODRIGUEZ agreed to meet at the "Joaquin Taco Shop." At approximately 8:43 p.m., QUARLES received an incoming telephone call from RODRIGUEZ on TT3. QUARLES told RODRIGUEZ he [QUARLES] was at the "Taco Shop." Based on these intercepts, I believe that QUARLES supplied RODRIGUEZ with 1/8 of an ounce of methamphetamine.

14. On October 26, 2016, at approximately 8:48 p.m., QUARLES called RODRIGUEZ. QUARLES said, "Hey what's up." RODRIGUEZ said, "What's happening with you now." QUARLES said, "What you want. An eight ball?" RODRIGUEZ said he would call QUARLES back to complete the deal. Based on these intercepts, I believe that QUARLES again supplied RODRIGUEZ with 1/8 of an ounce of methamphetamine.

15. On November 9, 2016, at approximately 11:41 p.m., RODRIGUEZ called QUARLES at TT3. QUARLES said, "What's up Al." RODRIGUEZ responded, "Hey What's up. What's up man." RODRIGUEZ and QUARLES then agreed to meet at the Food for Less. QUARLES asked, "How much do you want." RODRIGUEZ replied, "Teener [unit of methamphetamine]." Based on these intercepts, I believe that QUARLES again supplied RODRIGUEZ with methamphetamine.

16. On November 19, 2016, at approximately 12:05 p.m., QUARLES received an incoming telephone call from RODRIGUEZ on TT3. RODRIGUEZ asked QUARLES for a "half gallon" [half pound of methamphetamine]. RODRIGUEZ asked how much for the methamphetamine. QUARLES told RODRIGUEZ "eighteen-fifty" [$1850]. RODRIGUEZ reiterated that he wanted the price for "half gallon" [half pound of methamphetamine]. QUARLES told RODRIGUEZ, "seventeen-fifty" [$1750]. QUARLES told RODRIGUEZ he [QUARLES] would come to RODRIGUEZ and talk. RODRIGUEZ stated "Kinney's house" [**Target Location**]. QUARLES affirmed. Based on these intercepts, I believe that QUARLES traveled to the **Target Location** to supply RODRIGUEZ with a half-pound of methamphetamine.

17. On November 30, 2016, agents set up surveillance on RODRIGUEZ. Agents identified RODRIGUEZ driving a Green Ford Explorer (confirmed by previous intercepts with QUARLES) and traveling to the **Target Location**. Agents observed RODRIGUEZ park his vehicle outside the **Target Location** and then enter the **Target Location**. During this surveillance, agents also observed RODRIGUEZ carry a bag from his Explorer to the **Target Location**. Shortly thereafter, investigators watched several unidentified individuals enter and then immediately leave the Target Location. Based on the behaviors

of these individuals and the brief nature of their visit (along with the previous intercepts) to the **Target Location**, I believe that RODRIGUEZ was conducting drug transactions with them inside the **Target Location**.

18. On December 12, 2016, at approximately 5:49 p.m., RODRIGUEZ called QUARLES. QUARLES said, "Hey what's up Acapulco." RODRIGUEZ responded, "Hey I stay here in the Kenny house [**Target Location**]." QUARLES replied, "Ok I'll come right now." RODRIGUEZ replied, "Hey can you bring like one eight ball of paint and the other." QUARLES responded, "Yeah I'll be right there." Based on these intercepts, I believe that QUARLES traveled to the **Target Location** to supply RODRIGUEZ with 1/8 of an ounce of methamphetamine.

19. On January 3, 2017, investigators attempted a buy-walk from RODRIGUEZ at the **Target Location** utilizing CS-1.[1] At approximately 1:00 p.m., CS-1 traveled to the **Target Location** and knocked on the door. David Saffian answered the door and told CS-1 that "Acapulco" [RODRIGUEZ] was not home. CS-1 told Saffian that CS-1 was looking to purchase methamphetamine from RODRIGUEZ. Saffian told CS-1 that RODRIGUEZ would have methamphetamine for sale and after taking CS-1's number, told CS-1 that RODRIGUEZ would call CS-1 when he returned to the **Target Location**. At approximately 5:00 p.m., RODRIGUEZ called CS-1 and identified himself as "Acapulco." RODRIGUEZ told CS-1 that he had what he needed [methamphetamine for sale] and they agreed to meet at the **Target Location**.

20. Investigators set up surveillance outside the **Target Location**. CS-1 traveled to the **Target Location** and meet with Saffian and RODRIGUEZ. CS-1 asked RODRIGUEZ for methamphetamine. RODRIGUEZ questioned CS-1 as to who had dropped CS-1 off and how CS-1 knew where RODRIGUEZ lived. During his questioning,

[1] CS-1's prior convictions include Petty Theft, Possession of Drug Paraphernalia and Being Under the Influence of a Controlled Substance (2004, misdemeanors, probation). CS-1 has agreed to assist law enforcement in various investigations in return for monetary payments. CS-1 has been paid for information and services. CS-1 has consistently provided information that has proven credible and reliable.

RODRIGUEZ lifted his shirt to expose his waistband where CS-1 saw a firearm. RODRIGUEZ refused to sell methamphetamine to CS-1 until CS-1 could provide the name of someone that could vouch for CS-1. Based on this unsuccessful buy-walk, I believe that RODRIGUEZ continues to reside at the **Target Location** and continues to conduct drug transactions at the **Target Location**.

**BASIS FOR EVIDENCE SOUGHT IN SEARCH WARRANT**

21. Based upon my training and experience, consultation with other law enforcement officers experienced in drug investigations, and all the facts and opinions set forth in this affidavit, I believe that probable cause exists that the **Target Location,** is being used to further the distribution of controlled substances by RODRIGUEZ and his co-conspirators discussed above.

22. In addition, I know that:

a. Individuals involved in narcotics trafficking often maintain the following items in their residences and vehicles: controlled substances and paraphernalia for packaging, weighing, cutting, testing, distributing and manufacturing controlled substances. They will commonly have this contraband on hand, secreted at their premises or on their person or in their vehicle, in order to maintain the confidence of their customers as well as to satisfy their own habits. The selling of such contraband is an ongoing type of business, because it takes time to develop clientele, the nature of drug abuse requires a steady supply, and the business tends to be too lucrative to abandon. They also have "fruits" of their illegal sales on hand, including United States currency and other valuables.

b. Individuals involved in narcotics trafficking often maintain records of their narcotics transactions and other records of evidentiary value for months or years at a time. It is common, for example, for narcotics traffickers to keep pay/owe sheets or other papers of narcotics sold and monies owed. Such pay/owe sheets or papers are used as a basis for accounting and for settling existing debts. Such records are often maintained for a substantial period of time even after the debts are collected. I have found in my training and experience that such records are invaluable to narcotics traffickers and that such

records are rarely discarded. Finally, it has also been my experience that such records and pay/owe sheets also frequently include the names, identities and telephone numbers of suppliers, customers and coconspirators.

c. Individuals involved in narcotics trafficking must often rely on others to obtain their drugs and to help them market the narcotics. Frequently, traffickers maintain evidence of the identities of these co-conspirators at their residence and their vehicles.

d. Individuals involved in narcotics trafficking often utilize stash houses to store illegal narcotics; weigh, cut and package the illegal narcotics; store narcotics proceeds, and/or store information relating to their drug trafficking business.

e. Individuals involved in narcotics trafficking commonly earn income in the form of cash and try to legitimize these profits. In order to do this, traffickers frequently attempt to secrete, transfer and conceal the money by means, including, but not limited to: placing assets in names other than their own to avoid detection while maintaining control; laundering the money through what appears to be legitimate business or businesses; hiding money in their homes, safes and safety deposit boxes; or using the money to buy assets which are difficult to trace. Records of these and other types of transactions are often found at the residences of individuals involved in narcotics and firearms trafficking.

f. Individuals involved in narcotics trafficking often keep and maintain large amounts of United States currency at their residences and in their vehicles. Such funds are often used for every-day expenditures and to maintain and finance their ongoing narcotics business.

g. Additionally, individuals involved in narcotics trafficking often amass and maintain assets at their residence which were generated by their trafficking activities, or purchased with the cash earned from such trafficking.

h. Individuals involved in narcotics trafficking often maintain weapons, firearms and ammunition on their person or in their residence and/or vehicles. Such weapons and firearms are used, and can be used, as an instrumentality of the crime of possession and distribution of drugs and firearms. Furthermore, I am aware of instances in

which traffickers have maintained such items in their residences and vehicles in order to protect themselves and guard their drugs, firearms and profits, as well as for enforcement purposes during their narcotics and firearms dealings.

i. Residences and premises used by individuals involved in narcotics trafficking usually contain articles of personal property evidencing the identity of person(s) occupying, possessing, residing in, owning, frequenting or controlling the residence and premises.

j. Individuals involved in narcotics trafficking frequently communicate with co-conspirators by means of cellular telephones and electronic devices, such as computers, and usually maintain these items on their person and/or in their residences and vehicles.

23. It is also my opinion and belief that the above-described documents are currently possessed by narcotics dealers and manufacturers much the same way a legitimate business will maintain records and tools of its trade whether or not the business has a particular item in inventory on a given date. These documents are kept by narcotics dealers whether or not the dealer is in possession of any drugs or chemicals at any given moment.

**REQUEST FOR SEALING**

24. This is an ongoing investigation of which the Targets Subjects are unaware. It is very likely, based upon the above, that evidence of the crimes under investigation exists in the direct and indirect control of the Target Subjects. There is reason to believe, based on the above, that premature disclosure of the existence of the warrant will result in destruction or tampering with that evidence and seriously jeopardize the success of the investigation. Accordingly, it is requested that these warrants and their related materials be sealed until further order of the Court.

**CONCLUSIONS**

25. Based on all of the above, my experience and training, a review of documents and other relevant information I believe to be reliable, and discussions with other law

enforcement officers, it is my opinion that the items listed in Attachment B are fruits, instrumentalities or evidence of a violation of the following enumerated offenses: distribution of controlled substance, and conspiracy to do the same (21 U.S.C. Sections 841(a)(1) and 846); illegal use of a communication facility (21 U.S.C. Section 843(b)); and money laundering (18 U.S.C. Sections 1956-1957). It is also my opinion that there is probable cause to believe that the items set forth in Attachment B are present at the **Target Locations** as more fully described in Attachment A-1.

26. With the above information, I formally request the issuance of a search warrant authorizing a search of the **Target Location** and the seizure of items described with particularity in Attachment B to the Application and Affidavit for Search Warrant.

27. I declare under penalty and perjury the foregoing is true and correct to the best of my knowledge and belief.

Cameron Foster
HSI Special Agent

SUBSCRIBED and SWORN to before me
this 24th day of April 2017

The Honorable Ruben B. Brooks
United States Magistrate Judge

# ATTACHMENT A-1

## 2701 Island Avenue, San Diego, California 92102

## DESCRIPTION OF PROPERTY TO BE SEARCHED

The premises (depicted below) and all parts therein, including all rooms, safes, storage containers, surrounding grounds, trash areas, abandoned vehicles, sheds, garages assigned to or part of the residence located at 2701 Island Avenue, San Diego, California 92102. The residence is described as a two level residence with a wood trim exterior blue in color, grey shingled roof, and white colored wood trim. The front door is facing north with a black metal security screen. The number "2701" is located to the left of the front door in black metal lettering. The residence is further depicted in the following photograph:



## ATTACHMENT B

## ITEMS TO BE SEIZED

There is probable cause that the following constitute evidence of violations of 21 U.S.C. Sections 841(a)(1) and 846; 21 U.S.C. Section 843(b); and 18 U.S.C. Section 1956-1957 and that they will be found in the **Target Location**:

1. Controlled substances, including methamphetamine.

2. Paraphernalia for packaging, using, weighing, cutting, testing, distributing, and identifying controlled substance(s).

3. Documents reflecting the possession or distribution of controlled substances, the acquisition of property obtained with proceeds from narcotics trafficking, and interstate and foreign travel in connection with narcotics trafficking.

4. Money, assets, and evidence of assets derived from or used in the possession or distribution of controlled substances and records thereof; including banking and financial institution records.

5. Items or personal property tending to show identity of persons in ownership, dominion and control of the **Target Location**.

6. Photographs and video and audio recordings which document an association with other coconspirators and/or which display narcotics, firearms, or money and proceeds from narcotics transactions.

7. Weapons, firearms, firearms accessories, body armor, and ammunition and documents relating to the purchase and/or possession of such items.

8. Cellular telephones belonging to RODRIGUEZ.

All of the above constituting: (1) evidence of a violation of distribution of controlled substance, and conspiracy to do the same (21 U.S.C. Sections 841(a)(1) and 846); illegal use of a communication facility (21 U.S.C. Section 843(b)); and money laundering (18 U.S.C. Sections 1956-1957); (2) contraband, fruits of the same offense or other items illegally possessed; or (3) property designed for use, intended for use, or used in committing this offense.